An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA15-7

Filed: 15 September 2015

Mecklenburg County, No. 11 CVD 11022

KELLY-ANNE GIEN, Plaintiff,

v.

ANDRE GIEN, Defendant.

Appeal by Defendant from Order and Judgment entered 28 May 2014 by Judge Gary Henderson in Mecklenburg County District Court. Heard in the Court of Appeals 19 May 2015.

> *James, McElroy & Diehl, P.A., by Preston O. Odom, III, and Jonathan D. Feit, for Plaintiff.*
>
> *Mark Hayes for Defendant.*

STEPHENS, Judge.

Defendant Andre Gien appeals from the Mecklenburg County District Court's Order and Judgment in an action filed by Plaintiff Kelly-Anne Gien for, *inter alia*, equitable distribution. Andre argues that the district court erred in its valuation of his company, Lightening In A Jar, and in its valuation of shares of stock held as marital property in an Australian company called InMatrix. Andre also contends that the district court erred in distributing those assets solely to him and in ordering him

to pay a distributive award by liquidating certain assets. After careful review, we affirm in part, vacate in part, and remand the district court's Order and Judgment for further findings and proceedings consistent with this opinion.

## *I. Factual and Procedural History*

Kelly-Anne and Andre are citizens of Australia and were married there on 26 November 2000. In 2001, they moved to the United States and eventually settled in Mecklenburg County after living for a time in Florida. The parties planned to pursue an investment strategy by which they hoped to accumulate sufficient savings to finance their retirement and return to Australia. Andre has a background in business and accounting, and at the time the parties first arrived in this country, he was working for an Australian company called InMatrix, which he helped to co-found in the early 1990s by creating a proprietary software application. At some point in the mid-2000s, Andre left InMatrix and went to work for a company called CBIZ, where he worked for three to four years and, with the help of his colleague Ken Fleishman, developed a financial diagnostic software application called Global Financial Bridge ("GFB"). Andre then left CBIZ and began working for a company called Lightening In A Jar ("LIJ"), which is a Florida corporation that he and Kelly-Anne formed in June 2005. Since 2005, Andre has provided business consulting services for LIJ, which owns and markets the GFB software. Kelly-Anne assisted Andre during the marriage by keeping records for his various business interests.

The parties separated on 1 September 2009 and were divorced on 25 August 2011. There were two children born of the marriage, and, on 22 February 2011, the parties executed a Support Agreement for Payment of Alimony & Child Support and Interim Agreement for the Distribution of Marital & Divisible Property ("Separation Agreement"). The Separation Agreement provided, *inter alia*, that Andre "shall pay child support to [Kelly-Anne] for the benefit of the parties' minor children in the sum of $2,000 per month" in 25 installments beginning 1 April 2011. Kelly-Anne and the children returned to Australia shortly thereafter while Andre continued to reside in Mecklenburg County.

On 3 June 2011, Kelly-Anne filed a complaint in Mecklenburg County District Court alleging that Andre had "failed and refused to pay any amount toward[] his monthly $2,000 alimony obligation" and seeking money damages for Andre's breach of the Separation Agreement, specific performance of the Separation Agreement, equitable distribution, and attorney's fees. On 12 July 2011, Kelly-Anne served Andre with her first request for production of documents and her first set of interrogatories. Although Andre filed an answer denying any breach of the Separation Agreement and counterclaimed for equitable distribution on 22 August 2011, he failed to provide a timely response to Kelly-Anne's initial requests for discovery. On 15 September 2011, Kelly-Anne filed a Motion to Compel. On 7 November 2011, the parties consented to the trial court's entry of an Order to Compel Andre to respond to Kelly-

Anne's initial requests for discovery within 14 days and also pay her attorney's fees. Kelly-Anne filed her Equitable Distribution affidavit on 14 November 2011. On 22 November 2011, Andre provided Kelly-Anne with his responses to her initial discovery requests and then submitted an Equitable Distribution affidavit on 14 February 2012 which did not list a single asset, debt, or value and instead answered "TBD" for all categories. After repeatedly informing Andre in the following months that many of his responses to her discovery requests were significantly insufficient and that numerous documents were missing, Kelly-Anne's attorney filed a Motion for Contempt against Andre on 28 November 2012, and an amended Motion for Contempt on 16 January 2013. After entering an Order to Show Cause on 17 April 2013, the trial court granted Kelly-Anne's motion on 30 July 2013 and entered an Order for Contempt finding Andre in civil contempt of court for violating its 7 November 2011 Order to Compel. Andre then filed an amended Equitable Distribution affidavit on 9 August 2013. Both parties sought an unequal distribution of marital and divisible property in their own favor.

On 15 October 2013, the trial court entered a Consent Order to Withdraw permitting Andre's counsel of record to withdraw from representing him. Throughout the course of the litigation, Andre had been represented by three separate law firms, and this marked the second time the court had entered an order allowing his counsel to withdraw for good cause. When Andre stated that he intended to represent himself

at trial, the court warned him that the trial would involve complex and complicated legal issues that would be difficult for a layperson to understand. Andre affirmed that he understood this, but stated that although he had over $30,000 in the bank, he did not believe he could afford another attorney.

After a Final Equitable Distribution Pretrial Order ("FPTO") was entered on 3 December 2013, a three-day trial on the parties' claims began in Mecklenburg County District Court on 16 December 2013. During the marriage, the parties possessed two homes in North Carolina, one home in Florida, and a significant number of bank accounts, investment accounts, and equity interests in businesses. At trial, the parties disagreed strenuously over the value of two assets that are relevant to this appeal: the value of the parties' shares of stock in InMatrix and the value of LIJ.

With regard to the InMatrix shares, Andre stipulated in the FPTO that the shares were marital property, but also claimed in his amended Equitable Distribution affidavit that their date of separation value was "zero" because InMatrix "was sold in 2001-2002, and there were [sic] no distribution from the sale as venture capitalist which funded it received all funds." However, Kelly-Anne testified that on 1 July 2009, she received an email from the company's Director of Finance, David Byrne, which stated that the "total holding value that [the parties] have is 95,524 shares equating to a total share capital of $330,178." Although this email was admitted into evidence without objection, Andre argued that the stock had no value and attempted

to introduce documents that purported to show the company had been losing money and was sold shortly after the parties' date of separation in a "debt free, cash free" transaction that did not result in any significant distribution to its shareholders. The trial court, however, ultimately excluded this evidence because Andre never produced it in response to Kelly-Anne's requests for discovery and was unable to lay a proper foundation for the admission of the documents given his lack of familiarity with our State's rules of evidence and civil procedure. Kelly-Anne testified that, in light of Andre's longstanding relationship with the company and its principals, she would not feel comfortable being a shareholder and therefore requested that all the shares be distributed to Andre.

As for the parties' respective interests in LIJ, Kelly-Anne testified that she filed the articles of incorporation for the company, served as its registered agent and incorporator, was also listed along with Andre as one of its two directors, and was therefore surprised when Andre produced a document during discovery that was dated 9 June 2009, signed only by Andre, and purported to make him the company's sole director by "unanimous consent of [the] shareholders." In his trial testimony and during a pretrial deposition, Andre acknowledged several times that Kelly-Anne is a 50% owner of the business, but also claimed that LIJ essentially functions as a one-man operation that only earns money as a result of his personal efforts, explaining "outside my capabilities, [LIJ] has no value." Andre testified further that since the

date of separation, he has frequently charged his personal expenses to the business's account for meals, coffee, cigars, a home mortgage, legal fees, and purchases from Victoria's Secret.

According to certified public accountant Christopher Mitchell of Dixon Hughes, who testified as an expert on Kelly-Anne's behalf, this intermingling of business and personal expenses made it impossible to utilize the income approach to provide a valuation for the business. However, Mitchell testified further that he was able to arrive at a valuation of $350,000 for LIJ by applying the asset approach for business valuations and calculating the cost it would take to recreate the company's GFB software. Mitchell explained that he based his valuation on information contained in two documents Andre eventually produced during discovery. The first document Mitchell relied on was an ownership agreement ("the Holly/Lloyd agreement") dated 2 August 2013 that purported to convey two-thirds of Andre's interest in LIJ to two of his business associates, Mick Holly and Joshua Lloyd. Although this agreement was never fully executed, it included a heading noting that "Investment in GFB" consisted of "an amount of $350,000 incurred by Andre Gien in the development of the GFB product up to the date of this arrangement." The second document Mitchell relied on was an agreement dated 30 July 2013 ("the Fleishman agreement") that purported to grant Ken Fleishman a 50% interest in the GFB software and entitled him to claim up to $350,000 in proceeds on the occurrence of GFB's sale to a third

party as a result of Fleishman's significant financial contributions to the software's development. During his deposition, Andre testified that he had reached this agreement with Fleishman "five or six years ago" and that Fleishman had had "[p]retty much very little" to do with the software or the business since that time.

Given her lack of financial background, lack of confidence in the limited number of financial records Andre provided during discovery, and lack of involvement in the business since 2009, Kelly-Anne requested that LIJ be distributed solely to Andre, who in the FPTO had classified the company as marital, separate, and divisible property, and requested an equal distribution.

The trial on the parties' equitable distribution claims concluded on 18 December 2013. On 28 May 2014, the trial court entered an Order and Judgment awarding alimony and attorney's fees to Kelly-Anne and finding that an equal division of the parties' $2,190,509 distributable estate would be equitable. In its findings of fact, the court determined that the shares of InMatrix stock had a value of $330,178 and that the value of LIJ was $350,000 based on Mitchell's application of the asset approach. The court ordered that both these assets be distributed to Andre, based on its finding that an in-kind distribution would not be appropriate because

> a. The majority of the parties' marital assets distributed to [Andre] herein have been under the exclusive control of [Andre] since the date of the parties' separation, approximately four and a half years ago.

b. The business interests distributed to [Andre] herein were controlled and managed by [Andre] throughout the marriage and since the date of separation. [Andre] is the party with knowledge of the business interests, and with relationships with other owners and partners in the businesses.

c. [Kelly-Anne] lives in Australia and is the full-time custodian of the parties' minor children. It is not practical to distribute assets permanently located in the United States to her.

Based on these findings, the court concluded that in order to effectuate an equitable distribution, it would be necessary for Andre to pay a distributive award of $105,887 to Kelly-Anne, which the court found Andre had the ability to pay "through the liquidation of real estate, accounts, stock, or business interests distributed to him herein," and thus ordered him to do so within six months of the entry of the Order and Judgment. Through counsel, Andre gave written notice of appeal to this Court on 23 June 2014.

## II. Analysis

### A. Valuation of InMatrix shares

Andre argues first that the trial court erred in its $330,178 valuation of the parties' shares of stock in InMatrix because this valuation was not supported by competent evidence. We agree.

As this Court's prior decisions make clear, section 50-20(c) of our General Statutes requires that, in determining the value of marital property in an action for equitable distribution,

> the trial court is to determine the net fair market value of the parties' property based on the evidence offered by the parties. While there is no required method to follow in assessing the value of the parties' marital property, the approach utilized must be sound. In other words, the trial court must determine whether the methodology underlying the testimony offered in support of the value of a marital asset is sufficiently valid and whether that methodology can be properly applied to the facts in issue. In valuing a marital interest in a business, the task of the trial court is to arrive at a date of separation value which reasonably approximates the net value of the business interest.

*Robertson v. Robertson*, 174 N.C. App. 784, 785-86, 625 S.E.2d 117, 119 (2005) (citations, internal quotation marks, and brackets omitted); *see also Robinson v. Robinson*, 210 N.C. App. 319, 323, 707 S.E.2d 785, 789 (2011) (explaining that section 50-20 of our General Statutes requires the trial court to determine the net value of marital property by "consider[ing] the property's market value, if any, less the amount of any encumbrance serving to offset or reduce the market value") (citation omitted).

Furthermore, it is well established that, in an action for equitable distribution, the party claiming that property is marital property has "[t]he burden of proof . . . to show by a preponderance of the evidence that the property: (1) was acquired by either spouse or both spouses; (2) during the marriage; (3) before the date of the separation

of the parties; and (4) is presently owned." *Young v. Gum*, 185 N.C. App. 642, 647, 649 S.E.2d 469, 474 (2007) (citation omitted), *disc. review denied*, 362 N.C. 374, 662 S.E.2d 552 (2008). Marital property must be valued "as of the date of separation." *Id.* at 649, 649 S.E.2d at 475; *see also* N.C. Gen. Stat. § 50-21(b) (2013).

Our standard of review on appeal from a judgment entered after a non-jury trial for equitable distribution is

> whether there is competent evidence to support the trial court's findings of fact and whether the findings support the conclusions of law and ensuing judgment. The trial court's findings of fact are binding on appeal as long as competent evidence supports them, despite the existence of evidence to the contrary.
>
> The trial court's findings need only be supported by substantial evidence to be binding on appeal. We have defined substantial evidence as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.
>
> As to the actual distribution ordered by the trial court, when reviewing an equitable distribution order, the standard of review is limited to a determination of whether there was a clear abuse of discretion. A trial court may be reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason.

*Clark v. Dyer*, __ N.C. App. __, __, 762 S.E.2d 838, 839 (2014) (citation omitted).

In the present case, the trial court's Order and Judgment lists the value of the InMatrix shares at $330,178 but provides no additional factual findings to explain how it arrived at this determination. Our review of the record indicates that the court based this valuation on the email that Kelly-Anne testified she received from

InMatrix's Director of Finance David Byrne on 1 July 2009. While Andre concedes that, by failing to object to this email at trial when it was introduced into evidence, he has waived any right on appeal to challenge its admissibility on hearsay grounds, Andre nevertheless contends that the Byrne email is not competent evidence of the InMatrix stock's net value as of the date of separation.

The Byrne email states in pertinent part that

> I will not be able to provide you with a value of the shares, this should be done at your end.

> The total holding value that we have is 95,524 shares equating to a total share capital of $330,178[.][1]

On direct examination, Kelly-Anne offered the following testimony about the Byrne email and its effect on her opinion of the value of the parties' InMatrix shares:

Q    Okay. Now, I want you to leave that and go to the other notebook and go to Exhibit 80. Are you there?

A    Yes.

Q    Who is David [Byrne]?

A    He was the CEO of the company.

Q    Of what company?

---

[1] The Byrne email appears in the record as part of a longer chain that began when Kelly-Anne inquired about the "current share value" of the parties' InMatrix stock in a 25 June 2009 email to the company's chief executive officer Gary Challinor. In her email, Kelly-Anne stated that the parties were planning to move some of their shares into one of the parties' trust instruments. That same day, Challinor replied to Kelly-Anne by providing the company's audited 2008 accounts and balance sheet and referring her to Byrne for more information about transferring the shares, but also cautioned that "[a]s for valuing the shares, I think it is more appropriate that your accountant do this for you. As you will see from the [2008 accounts and balance sheet] the business is up for sale and we are working with a number of interested strategic parties."

A InMatrix.

Q And what's the date of this email from David [Byrne] to you and Mr. Gien?

A First of July of 2009.

Q Okay. So, in 2009 you got an email and Mr. Gien got an email from Mr. [Byrne] saying that value, the holding value for InMatrix was 95,524 shares equating to a total share capital of $330,178; you see that?

A Yes.

Q Okay. Is that 2009 email consistent with Mr. Gien's statement, sworn statement, in his Amended ED Affidavit that the stock was sold in 2001 for zero?

A No.

Q So, at a minimum, do you believe that the 95,524 shares that Mr. Gien apparently has is worth $330,178?

A Can you ask the question again?

Q At a minimum --

A Yes.

Q -- is the InMatrix stock that as of 2009 Mr. [Byrne] says Mr. Gien had, some eight years after Mr. Gien said it was gone --

A Yes.

Q -- is it worth, at minimum, $330,178?

> A    Yes.

However, when asked on cross-examination about the email and its impact on her opinion of the value of the parties' shares, Kelly-Anne testified as follows:

> Q    So, Ms. Gien, are you saying that the value of InMatrix is $331,000.
>
> A    I'm saying --
>
> Q    Or 330 -- Sorry, pardon me, 330,000?
>
> A    Well, David [Byrne] is -- David [Byrne], the director of finance is.
>
> Q    So is that what you're claiming?
>
> A    Can you explain what you mean?
>
> Q    Is that -- Is that -- Is that your claim to the value of InMatrix?
>
> A    It's not the value that I believe in the ED.
>
> Q    So what value do you put in for InMatrix in your opinion?
>
> A    I think it's 200 in the ED. . . .

From our review of the record, Kelly-Anne's testimony of "200" as the value of the InMatrix shares appears to be in reference to the fact that the shares were listed at a value of $205,000 for the years 2008, 2009, 2010, 2011, and 2012 on the balance sheet of a trust instrument the parties owned.

In addition to the Byrne email, the court admitted into evidence InMatrix's annual financial report for the financial year ending 30 June 2009 and an email Kelly-Anne said Andre had forwarded to her on 20 August 2009 from InMatrix's Chairman, David Smorgon, to the company's shareholders advising them that InMatrix had received a letter of intent from SunGard Data Systems, Inc., to acquire all the issued share capital of InMatrix. Kelly-Anne's counsel relied on these exhibits primarily to demonstrate that Andre's assertion that the parties' InMatrix shares had no value because the company was sold in 2001-02 was false. However, InMatrix's 2009 financial report also includes an independent audit prepared by Deloitte stating that the company had lost over six million Australian dollars (AUD) in 2008 and seven million AUD in 2009; that the company had over 25 million AUD in liabilities and only five million AUD in assets at the close of the 2009 financial year; and that total equity attributable to equity holders amounted to a sum of negative 20,615,188 AUD. In addition, under a heading titled "Issued capital," the report noted that InMatrix had a total of 844,564 "fully paid ordinary shares" in both 2008 and 2009 and that the balance for these shares at the beginning and end of both financial years was 8,699,675 AUD. Finally, under a heading titled "Subsequent Events," the report stated that InMatrix had entered into a letter of intent to sell the company and its subsidiaries in a transaction that "is anticipated to be on a debt free, cash free basis." Under cross-examination by Andre, Kelly-Anne acknowledged that InMatrix had

been sold shortly after the parties' date of separation. When Andre asked how much they had received as shareholders from the proceeds of the sale, Kelly-Anne answered, "Not much."

Based on this record, we cannot conclude that the Byrne email constitutes competent evidence of the net value of the parties' InMatrix shares as of the date of separation. We note first that the Byrne email explicitly refrains from offering any opinion as to value, and instead provides information about "share capital." Moreover, no additional testimony or evidence was offered by either party as to how share capital relates to the statutorily required net fair market value of the shares, or how the share capital value quoted in the Byrne email relates to the "issued capital" reported in the 2009 report, and the trial court provided no additional findings in its Order and Judgment to clarify either of these points.

In his appellate brief, Andre contends—consistent with definitions of the term provided by Investopedia.com and the Australian Securities & Investments Commission—that share capital is simply a measure of the money used to purchase shares of stock directly from a company and does not vary with market demand because market forces have no impact on the historical fact that an owner paid a set sum for a certain stock. Kelly-Anne contends in her brief that this does not necessarily render the Byrne email incompetent as evidence of the net fair market value of the InMatrix shares in light of this Court's prior decisions in *McManus v. McManus*, 76

N.C. App. 588, 334 S.E.2d 270 (1985) and *Barton v. Barton*, 215 N.C. App. 235, 715 S.E.2d 529, *appeal dismissed*, 365 N.C. 364, 719 S.E.2d 20 (2011), wherein we upheld valuations of marital property that were based in part on the amounts originally paid to purchase that property. However, this argument ignores the fact that in both *McManus* and *Barton*, the property valuations at issue were also supplemented by more recent, post-purchase data. *See McManus*, 76 N.C. App. at 592-93, 334 S.E.2d at 273 (upholding the trial court's valuation of a stock based in part on its original purchase price, as well as the price the husband subsequently paid for more of the same stock and the dividends earned therefrom); *Barton*, 215 N.C. App. at 245-46, 715 S.E.2d at 534-35 (upholding arbitrator's valuation of real property based in part on the original purchase price, as well as the cost of subsequent investments in the property).

Here, even assuming *arguendo* that the Byrne email accurately states how much the parties spent to acquire their shares in InMatrix at some point in time, it makes no reference to when or how those shares were acquired or whether and to what extent their value subsequently increased or decreased, which we find particularly significant in light of the company's 2009 financial report. We therefore conclude that although the Byrne email might provide some evidence of how much the parties paid to acquire their shares in InMatrix, it does not constitute competent evidence of their net fair market value as of the date of separation. Furthermore,

although it is well established that "[t]he owners of property have generally been held to have both a knowledge and basis for the testimony as to the value of their property," *Finney v. Finney*, 225 N.C. App. 13, 16, 736 S.E.2d 639, 642 (2013) (citations omitted), in this instance, we conclude that Kelly-Anne's testimony is not competent evidence to support the court's valuation of the InMatrix shares, given that her direct testimony appears to be based entirely on the Byrne email, which is not competent evidence for the reasons already stated, and is contradicted by her subsequent testimony on cross-examination that she believed the value of the shares was actually "200."

Finally, in reaching this conclusion, we also reject Kelly-Anne's argument that even if the Byrne email were deemed inadmissible hearsay, it would nonetheless constitute competent evidence to support the trial court's valuation of the InMatrix shares given Andre's failure to object when it was introduced at trial. In support of this argument, Kelly-Anne cites our Supreme Court's prior decision in *Lambros v. Zrakas*, 234 N.C. 287, 66 S.E.2d 895 (1951), as well as this Court's more recent holding in *In re F.G.J.*, 200 N.C. App. 681, 684 S.E.2d 745 (2009), both of which Kelly-Anne contends demonstrate that when hearsay testimony is received into evidence without objection, it carries full evidentiary value and must be considered competent evidence. But this argument fails insofar as it conflates the concept of evidentiary

admissibility with the concept of evidentiary competence and ignores critical distinctions between the present facts and those at issue in *Lambros* and *F.G.J.*

In *Lambros*, for example, the plaintiff was a surgeon who brought suit against his former patient and her husband, alleging that they had agreed to pay $3,000 for his services but then refused to pay that amount in full. 234 N.C. at 289, 66 S.E.2d at 896. At trial, the plaintiff testified without objection about several discussions he had with the defendant-patient and her family before performing the surgery, including a conversation in which her son agreed to certain terms after stating he was acting on his mother's behalf. *Id.* When the jury returned a verdict in the plaintiff's favor, the defendants appealed, arguing that the testimony that their son had served as their agent was hearsay and should have been excluded. *Id.* However, even though our Supreme Court agreed that the challenged testimony was hearsay, it refused to disturb the jury's verdict, in part because by failing to object the defendants had waived their right to challenge the admissibility of the hearsay testimony, and also because "when considered with the rest of the evidence in the case, [the hearsay testimony] was sufficient to warrant the jury in finding the issue of agency against" the defendant. *Id.* at 289, 66 S.E.2d at 897.

In *F.G.J.*, this Court reviewed an appeal from an order terminating the respondent-parents' parental rights to their two minor children on the grounds of willful abandonment and leaving the children in an outside placement for more than

one year without making reasonable progress to correct the conditions that led to their removal from the home. 200 N.C. App. at 686, 684 S.E.2d at 749. The children had been removed from the respondents' home in 2005 due to repeated reports of domestic violence and alcohol abuse, and although the termination order included findings of fact that both respondents participated in classes addressing the issues that led to removal of the children throughout 2007-08, the district court based its conclusion that both respondents had failed to make reasonable progress on factual findings that focused on additional reports of domestic violence and alcohol abuse involving both respondents in early 2006. *Id.* at 692, 684 S.E.2d at 753. We therefore agreed with the respondent-parents that the district court failed to support its conclusion that grounds existed for termination with sufficient factual findings. *Id.* However, we declined to reverse the termination order outright in light of testimony offered during the termination hearing by the children's maternal uncle and guardian, who testified without objection that the respondent-mother had told him about several additional instances of domestic violence and alcohol abuse involving both respondent-parents in 2007 and 2008. *Id.* at 692-93, 684 S.E.2d at 753. Although the respondent-father argued this testimony constituted inadmissible hearsay, we observed that because "no objection on hearsay grounds was made by either parent at trial. . . . any objection has been waived, and the testimony must be considered competent evidence." *Id.* at 693, 684 S.E.2d at 753-54 (citation omitted).

Nevertheless, we also rejected the petitioner's argument that this evidence standing alone should be considered sufficient to uphold the order, which we vacated and remanded for additional findings of fact. *Id.* at 693, 684 S.E.2d at 754.

It is clear from our review of these cases that if a party fails to object when hearsay testimony is introduced at trial, she waives her right to challenge its admissibility on appeal. When such hearsay testimony is competent to settle an issue in dispute—such as whether the defendants' son acted as their agent and agreed to certain terms, as in *Lambros*, or whether the respondent-parents continued to engage in domestic violence and alcohol abuse, as in *F.G.J.*—it carries "full evidentiary value." 234 N.C. at 289, 66 S.E.2d at 896. However, it does not logically follow that such hearsay testimony is automatically rendered competent evidence of anything it might be offered to prove, or that a party's failure to object to its admissibility at trial somehow immunizes an otherwise defective order based upon such evidence from appellate review. In the present case, this means that although Andre waived his right to challenge the Byrne email's admissibility on appeal by failing to object when Kelly-Anne offered it into evidence at trial, this Court remains obliged to review whether the Byrne email constitutes competent evidence for settling the disputed issue of the InMatrix shares' value. For the reasons already discussed *supra*, we conclude that the Byrne email does not settle the issue in dispute, and thus we cannot

consider it competent evidence of the value of the InMatrix shares as of the date of separation.

Accordingly, we hold that the trial court erred in its valuation of the parties' InMatrix shares, and we consequently vacate its finding and remand this issue for further findings of fact and, if necessary, the taking of additional evidence. We fully recognize that actions for equitable distribution are often among the most complex and cumbersome cases our State's district courts must handle, and we note that apart from its error in valuing the parties' InMatrix shares, the trial court dealt thoroughly and admirably with the particular challenges posed by this case, challenges which were undoubtedly exacerbated by Andre's *pro se* representation and repeated failures to comply with discovery requests. We also note that despite Andre's protestations that the InMatrix shares had no value, there appears to be competent evidence in the record upon which the trial court could properly base its valuation on remand. This evidence includes the company's 2009 financial report, which could provide the basis for expert testimony, as well as the balance sheets from the parties' trust instrument listing the shares at a value of $205,000 for the years 2008, 2009, 2010, 2011, and 2012, which appears to be consistent with Kelly-Anne's trial testimony that, in her opinion, the shares were worth "200." To be clear, we do not intend to opine and are not opining as to the weight of this evidence, nor are we suggesting that these are the only valid bases on which the trial court may rely for its valuation on remand.

Whatever conclusion it reaches on this issue, we urge the trial court to adequately support its determination with specific factual findings to explain the basis of its reasoning.

Our decision to remand the case based on this issue also necessarily vacates the Order and Judgment's ultimate distribution of the parties' marital property, including its order for Andre to pay a distributive award by liquidating assets, and therefore obviates any need for this Court to address Andre's additional arguments on that issue as well as his claims that the trial court erred because it failed to distribute the diminished value of the InMatrix shares as a divisible asset, and because its findings of fact did not support its decision to forego an in-kind distribution.

*B. Valuation of LIJ*

Andre also argues that the trial court erred in its valuation of LIJ at $350,000 based on Mitchell's application of the asset approach. Specifically, Andre contends that Mitchell's valuation was not supported by competent evidence of LIJ's value as of the date of separation. We disagree.

At trial, Mitchell offered the following testimony in support of his valuation of LIJ:

> Q    And is there anything in [the Holly/Lloyd agreement] that allows you to have some information with respect to -- or how to utilize the asset approach in valuing Lightening in a Jar Global

Financial?

A    There is, there's a very important piece of information in that document.

Q    Okay. And, tell the Court what the important piece of information is.

A    Investment in Global Financial Bridge an amount of 350,000 incurred by Andre Gien in the development of the Global Financial Bridge product up to the date of this agreement.

Q    Okay. And, why is $350,000 important -- why does that number help you?

A    In trying to figure out the value of this product that Mr. Gien has created one of [the] techniques within the asset approach would be the cost to recreate it. So, if -- Chris Mitchell were to say, "Hey, I want to develop some type of software that has the same functionality of what Mr. Gien has created, how much would it cost me to go and hire people or to do it myself and to recreate that -- that -- that software?" And so, this evidence says that it would take about $350,000 for someone to embark on that -- on that exercise and that is [an] indication of the value of that software.

Q    And then, if we also look, Mr. Mitchell, at [the Fleishman agreement]. What does [the Fleishman agreement] tell us with respect to the $350,000 and what portion of the value of the asset $350,000 represents?

A    Well it tells us that Mr. Fleishman will restrict his portion of ownership to $350,000 which -- which is the same number that we saw in -- in [the Holly/Lloyd agreement].

Q   So, one could infer from that that the value of that asset is $700,000 with Mr. Gien's agreement to Mr. Fleishman to get $350,000?

A   I'm not sure.

Q   Okay. Well, it's possible that it's more than $350,000, correct, based on [the Fleishman agreement]?

A   That's correct. If, if, if you sold that product for, you know, $1,000,000, Mr. Fleishman would be restricted to some amount, but -- So it could be sold for more.

Q   The $350,000 asset approach number would be, again, the, the floor value, correct?

A   For that particular asset.

Q   Right. And, when looking at the business as a whole, there might be other assets or if there would be other assets that one would consider in doing the asset approach, correct?

A   That's correct.

Q   What other assets in addition to the $350,000 represented in [the Holly/Lloyd agreement] would you look at to value the business?

A   Any cash in the bank account, accounts receivable, any good will; those type of things.

Q   Okay. So, is it accurate to say that based on -- let me ask you this, do you – you've been provided information, documentation, from my office, correct?

A   That's correct.

Q      And is there documentation that you've been
       provided that you've not been able to rely on that's
       been produced by Mr. Gien in order to use a
       particular approach?

A      Well, you know, looking at the profit information
       from the financial statements, I don't know if it has
       a whole lot of meaning because there's personal type
       items in the expenses.

Q      Okay. Is, is [the Holly/Lloyd agreement] the best
       piece of evidence that you've been given to allow you
       to come up with a portion of the asset approach
       valuation?

A      Yes, sir.

Q      Okay. And, that number's $350,000?

A      Yes, sir.

In its Order and Judgment, the trial court found that LIJ had a date of separation

value of $350,000, explaining in a footnote that "[t]he [c]ourt, after considering the

testimony of Christopher Mitchell of Dixon Hughes, applied the asset approach in

determining the value of this asset."

On appeal, Andre argues that the court's LIJ valuation is not supported by

competent evidence of the company's value as of the date of separation. In support of

this argument, Andre emphasizes Mitchell's reliance on the Holly/Lloyd agreement,

which stated that Andre had incurred "an amount of $350,000" in the development of

the GFB software "up to the date of this agreement" and was dated 2 August 2013.

Andre therefore contends that we must vacate the court's valuation of LIJ because

Kelly-Anne failed to introduce any other evidence as to the timing of his investment in the GFB software or its value before the date of separation. However, in light of Mitchell's testimony that he also relied on the Fleishman agreement in reaching his determination of LIJ's value, this argument fails.

The Fleishman agreement provides, in pertinent part:

> It is agreed that the ownership of the [GFB] software is equally owned by Ken Fleishman and Andre Gien.
>
> Ken Fleishman will restrict his portion of the ownership to $350,000 which is payable on the occurrence of
>
> 1. The outright sales of the GFB software to a third party[.]
>
> 2. Any other payment made to any other person that relates to the value of GFB.
>
> 3. If the amount of the sales price per item 1 is less than $700,000 Ken Fleishman shall receive 50% of the agreed sales proceeds.
>
> 4. If any consideration is provided to any other person in relation to the GFB product Ken Fleishman shall be paid first, before any payment is made to any other person.

Furthermore, as Andre testified during his pretrial deposition on 28 October 2013:

> Q.    How about Ken?
>
> A.    Well, now I've still got an obligation to Ken. So I eventually -- What we did was over the years I said: Look, Ken, I've got the code. It's starting to sell a little bit but I can't pay you your money, you know. There is no loan agreement or no -- I can't pay you your money. However, what I can do is what if we come to some kind of agreement? What if it's -- if we

sell this code, all the -- the -- you know, whatever -- whatever we can do with this piece of software at some point and I give you a sum of money.

Q.     When was this?

A.      Oh, this was a long time ago. This must have been -- whew -- oh, five, six years ago. Somewhere around there.

Q.     Okay. So --

A.     So I'll give you a sum of money if we can sell the code because -- and so he said, look, you know, at the end of the day, okay, I -- you know, the money is written off, a lot of things have happened, you know, but we came to a figure that we sort of agreed upon which was if we sell it for I think it was more than $350,000 he will get the first $350,000. If it was sold for less than $350,000 we would just split it half --

Q.     And did you sign something?

A.     Eventually I -- I there is a document somewhere that I sent to him that because of this whole thing that I said, okay, this -- you know, this is basically what our verbal agreement --

Q.     Has the document been signed?

A.     I don't know. I'm not sure. I can -- I can get it signed.

Q.     Yeah. I'm not asking you whether you can get it signed. I'm asking whether there's a signed document by Mr. Fleischman[].

A.     I don't believe today there's a signed document, no.

Q.     And, in fact, the document you sent is from July of 2013, correct?

A.    Correct. Yeah. No. It's something recently that I even would put this into writing.

Q.    Right. But this is based on a conversation and an agreement that you say you had reached five or six years ago?

A.    Correct. Yeah.

Q.    And has Mr. Fleishman[] had anything to do with the business, the software, the code, in the last five or six years?

A.    Pretty much very little.

Andre insists that the $350,000 referenced in the Fleishman agreement merely recognizes an informal secured interest that has no relation to the $350,000 he incurred in GFB's development up through 2013 as referenced in the Holly/Lloyd agreement. Nevertheless, Andre's deposition testimony clearly indicates that although he did not enter into any formal written agreement with Fleishman until 2013, the two men had reached an agreement "five or six years ago" regarding Fleishman's compensation for his financial support in the development of the GFB software. Given the date of Andre's deposition, and his testimony that Fleishman had "[p]retty much very little" involvement after the two men reached their agreement, we can infer that the events that gave rise to the Fleishman agreement occurred in 2007 or 2008. From this, we can further infer, based on the asset approach Mitchell described in his testimony, that as of the date the parties separated on 1 September

2009, it would have cost at least $350,000 to recreate the GFB software. Consequently, we have no trouble in concluding that the trial court's finding as to the value of LIJ is sufficiently supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Clark*, __ N.C. App. at __, 762 S.E.2d at 839. Accordingly, we hold that the trial court did not err in its valuation of this asset.

AFFIRMED in part, VACATED in part, and REMANDED in part.

Judges BRYANT and DIETZ concur.

Report per Rule 30(e).